**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**UNITED STATES OF AMERICA ex rel. DR. SET SHAHBABIAN,**

**Plaintiff,**

**v.**

**TRIHEALTH, INC., et al.,**

**Defendants.**

**Case No. 1:20-cv-67**

**JUDGE DOUGLAS R. COLE**

**OPINION AND ORDER**

Relator Dr. Set Shahbabian brings this False Claims Act (FCA) suit on behalf of the United States against a group of hospitals and a neurosurgery physician group. He says those hospitals and the physician group entered a quid pro quo arrangement: the physician group agreed to refer its patients to the hospitals and, in return, the hospitals agreed to refer their patients to the physician group and also offered various other items of value. And because, according to Shahbabian, that quid pro quo violated federal law, he alleges that every reimbursement claim Defendants submitted to the United States for patients treated downstream of that agreement was a false claim under the FCA.

Defendants moved to dismiss on several different grounds. (Docs. 38, 40, 42, 45). Their first avenues of attack were to claim that the FCA's qui tam provisions violate Article II's Appointments Clause and Take Care Clause and that Shahbabian lacked Article III standing. (Docs. 38, 39, 45, 46). But the Court rejected those

arguments in an earlier decision, (Doc. 66), and the Sixth Circuit declined to hear an interlocutory appeal (Doc. 67), so that is no longer at issue.

But that still leaves two arrows in the Defendants' quiver. First, they argue that the FCA's first-to-file rule bars this action, as Shahbabian filed his initial complaint on the heels of another similar case, *United States ex rel. Murphy v. TriHealth, Inc.*, No. 1:19-cv-168 (S.D. Ohio Mar. 4, 2019). (Docs. 38, 39, 45, 46). Separately, Defendants argue that Shahbabian failed to state a claim under Rule 12(b)(6) and failed to allege fraud with the particularity Rule 9(b) demands. (Docs. 40, 41, 42, 43). Additionally, and somewhat more recently, Shahbabian filed a motion to consolidate this case with *Murphy*, (Doc. 68), which Defendants opposed, (Doc. 70). So, as things stand, those three items are on the Court's plate.

Taking them in order, the Court first finds that the FCA's first-to-file rule does not bar the complaint. Turning to the merits, the Court concludes that Shahbabian fails to state a claim under the FCA and so **GRANTS** Defendants' Rule 12(b)(6) motions to dismiss. (Docs. 40, 42). Because that dismissal is on pleading grounds, though, it is **WITHOUT PREJUDICE**. In connection with that, the Court **GRANTS** Shahbabian thirty days to seek leave to file an amended complaint, attaching that proposed complaint. If Shahbabian declines to do so, the Court will terminate this matter. Finally, given the dismissal, the Court **DENIES** Shahbabian's motion to consolidate, (Doc. 68), as **MOOT** at this time. Should the Court grant Shahbabian leave to file an amended complaint, he is free to renew the motion to consolidate then.

## BACKGROUND[1]

"The False Claims Act 'prohibits submitting false or fraudulent claims for payment to the United States, and authorizes *qui tam* suits, in which private parties bring civil actions in the Government's name.'" *United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813, 822 (6th Cir. 2021) (quoting *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404 (2011)). Relator Dr. Set Shahbabian is one such private party. He brings this qui tam action against TriHealth, Inc., Good Samaritan Hospital of Cincinnati, Ohio (Good Samaritan), Bethesda Hospital, Inc. (Bethesda North), and the Mayfield Clinic, Inc. (Mayfield). (Doc. 9, #1063). As TriHealth, Inc. is a corporate partnership between Good Samaritan and Bethesda North (the two hospital defendants), the Court uses "TriHealth" as the collective moniker for those three defendants. (*Id.* at #1065). Mayfield, on the other hand, "is the largest independent neurosurgery group practice in the Cincinnati Tristate area," meaning it is a group of doctors. (*Id.* at #1066). As explained in greater detail below, Shahbabian alleges that TriHealth and Mayfield engaged in an illegal referral scheme with one another, violating the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733. (*Id.*).

---

[1] Because this matter comes before the Court on various motions to dismiss under Rule 12(b)(6) and Rule 12(b)(1), the Court must accept the well-pleaded allegations in the complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But the Court reminds the reader that they are just that—allegations.

**A. TriHealth and Mayfield Enter into Two Agreements.**

Shahbabian is a board-certified neurosurgeon licensed in Ohio. (*Id.* at #1065). He says Defendants' unlawful referral scheme greatly harmed his practice in recent years. But his relationship with some of the defendants goes back much further—he first began conducting neurosurgeries at Good Samaritan in the late 1960s. (*See id.* at #1065, 1082). During the intervening decades, Shahbabian averaged some 400 to 600 surgeries per year at that hospital. (*Id.* at #1082).

But that relationship began to morph in 2014, when TriHealth approached Shahbabian about purchasing his medical practice and making him a TriHealth employee. (*Id.*). TriHealth did so in anticipation of Shahbabian's upcoming retirement (he was 76 at the time) and based on its desire to retain Shahbabian's surgical practice in house. (*Id.* at #1082–83). Shahbabian agreed to the deal. So, effective January 2014, both parties signed an employment agreement that had a five-year term, with an option for renewal. (*Id.* at #1083). Under that agreement, Shahbabian was to continue practicing high volume neurosurgery at Good Samaritan, and now as a formal employee, could do so nowhere else. (*Id.*). The agreement included a noncompete, and it tied his compensation to the amount of revenue he produced. (*Id.*). A few months later he also sold his medical practice's assets to TriHealth. (*Id.*).

But, according to Shahbabian, TriHealth had ulterior motives. TriHealth was plotting to "involuntarily transition[]" Shahbabian's practice, which included a "physician referral base and extensive surgical practice," to the physicians in Mayfield's neurosurgery practice. (*Id.*). To that end, shortly after securing Shahbabian's practice and employment, in June 2014, TriHealth also formalized a

separate agreement (the co-management agreement) with Mayfield. (*Id.*). That agreement marked the start of a partnership that forms the basis of this case.

The co-management agreement primarily called for Mayfield to provide certain services to TriHealth and its patients. (*Id.* at #1084). Specifically, Mayfield agreed to provide "expanded comprehensive neurosurgery services" to patients in the TriHealth system, including patients at both Good Samaritan and Bethesda North Hospitals. (*Id.*). TriHealth paid Mayfield $80,417 per month to provide on-call services and an additional $175,000 per year if Mayfield met certain quality initiative targets. (*Id.*). TriHealth and Mayfield's agreement also included appointing Dr. Ringer, a Mayfield shareholder, as the Medical Director of Neurosurgery for the TriHealth Surgical Institute at Good Samaritan. (*Id.*). One more feature bears mention—the arrangement required TriHealth to exclusively refer all of Good Samaritan's and Bethesda North's emergency room and unassigned neurosurgery patients to Mayfield physicians for treatment. (*Id.*). That is central to the case here for two reasons: (1) this case is about allegedly illegal referrals, and (2) the provision meant that Shahbabian—whose pay depended on his personal patient volume—lost the opportunity to treat these unassigned patients. (*Id.*).

TriHealth and Mayfield later entered an amendment detailing services that Mayfield doctors would provide. (*Id.* at #1084–85). Yet despite Mayfield receiving cash compensation for those services, "[n]o fair market value determination was conducted." (*Id.* at #1085).

The next year, 2015, TriHealth underwent a management change, hiring a new chief executive and new chief operating officer. (*Id.*). The new leadership sought to deepen its relationship with Mayfield. Mark Clement, the new CEO, had a "vision" to exponentially increase TriHealth's neurology department business. (*Id.*). Key to that expansion was "consummat[ing] the business relationship between Mayfield and TriHealth." (*Id.*). That entailed TriHealth continuing to "take affirmative steps to transition Shahbabian's physician referral base to Mayfield for the 400+ neurosurgeries a year performed by [Shahbabian]" in return for Mayfield "redirect[ing] surgical patients from other hospitals in the greater Cincinnati area to TriHealth facilities." (*Id.* at #1085, 1125–26).

In 2016, the arrangement continued to evolve. TriHealth's new COO, Gail Donovan, retained a third-party consultant to assist TriHealth's neurosurgical services expansion. (*Id.* at #1085). Before its expansion, TriHealth was not a leader in the neurosurgery field, employing only Shahbabian and one other neurosurgeon. (*Id.* at #1086). And Mayfield, despite providing call coverage under the 2014 agreement, used TriHealth hospitals for only a select number of cases. (*Id.*). Indeed, at the time, some 80% of Mayfield's neurosurgical procedures were performed at UC Health. (*Id.*). Donovan sought to change that, so he began to explore building on TriHealth's partnership with Mayfield. (*Id.*).

By April 14, 2016, TriHealth and Mayfield moved forward with what Shahbabian calls "a quid pro quo kickback scheme." (*Id.* at #1087). TriHealth offered to transition Shahbabian's physician referral base and his attendant surgical practice

to Mayfield—that is, the hospital agreed to refer patients to the physician group. (*Id.*). And "[i]n exchange, Mayfield agreed to redirect to TriHealth medical facilities thousands of Mayfield patient surgeries anticipated to be performed at UC Health." (*Id.*). In other words, Mayfield was providing referrals to TriHealth (patients Mayfield otherwise would have sent to UC Health) for TriHealth's agreement to refer patients to Mayfield. But to move forward, Mayfield also had some additional demands. (*Id.*). Those included (1) Dr. Norberto Andaluz obtaining hospital privileges at Good Samaritan, (2) TriHealth disclosing the potential size of its financial investment into neurosurgery facilities, and (3) a commitment from TriHealth regarding the transition of Shahbabian's surgical practice. (*Id.*). TriHealth agreed to those terms, and the parties began drafting a formal written plan. (*Id.* at #1088–89).

As finally implemented, the plan included: (1) Mayfield hiring a neurosurgeon replacement to assume Shahbabian's practice at Good Samaritan, (2) TriHealth promoting the use of that replacement surgeon to Shahbabian's existing physician referral base, and (3) TriHealth agreeing to invest "in brick and mortar, capital, equipment, and staff." (*Id.*). Beyond that, TriHealth continued to solicit Mayfield's participation in crafting a new 2017 co-management agreement. (*Id.*). Importantly, on September 12, 2016, the parties met and discussed the number of patients Mayfield planned to redirect from UC Health to TriHealth as part of what Shahbabian characterizes as the kickback scheme. (*Id.* at #1094).

By January 9, 2017, TriHealth's executive leadership received an email outlining some of the details relating to that "scheme." (*Id.* at #1117–19). That email

discussed the following: (1) that Neurosciences Strategic Plan investments would cost an estimated $47.6 million; (2) that TriHealth would assume various responsibilities under the co-management agreement, including paying fees to Mayfield for on-call service, paying Mayfield physicians fees to serve in administrative positions, and paying Mayfield a fee for what Shahbabian calls a "Sham Quality Initiative Program Development;" (3) an anticipated increase in patient volumes (on a doctor-by-doctor basis) that would result from redirecting surgical patients from UC Health to TriHealth; and (4) that Dr. Tempel would assume most of Dr. Shahbabian's surgical cases and transition them to TriHealth. (*Id.*).

So, according to Shahbabian, when Clement (TriHealth's CEO) approved the kickback scheme on January 10, 2017, TriHealth was aware of the following:

> (1) Mayfield agreed to redirect thousands of surgeries from UC Health to TriHealth as a quid pro quo kickback;
>
> (2) TriHealth agreed to transition Dr. Shahbabian's surgical practice to Mayfield and Tempel;
>
> (3) TriHealth had budgeted expenditures of $46 million in capital and operating expenses for Good Samaritan and Bethesda North to accommodate Mayfield's redirection of UC Health surgical cases;
>
> (4) TriHealth would pay over $2,000,000 a year to Mayfield under a new Clinical Co-Management Agreement that had not been evaluated for fair market value; and
>
> (5) TriHealth agreed to refer to Mayfield physicians all unassigned patients presenting themselves at TriHealth facilities for inpatient procedures including but, not limited to, cranial and spine surgeries.

(*Id.* at #1120).

On May 2, 2017, TriHealth executed the next step in the scheme, informing Shahbabian that his employment contract would not be renewed after it expired in

April 2019. (*Id.* at #1121). Unbeknownst to Shahbabian, that transition also involved Dr. Tempel and Mayfield taking over all future surgeries from Shahbabian's referring and employed physicians within TriHealth. (*Id.*). A week later, TriHealth and Mayfield finally entered the renegotiated 2017 co-management agreement, formally consummating what Shahbabian calls the kickback scheme. (*Id.*).

One week after that, TriHealth forced Shahbabian to stop performing neurosurgeries by threatening to initiate internal review processes and report him to the Ohio State Medical Board for "alleged quality of care issues." (*Id.*). His scheduled surgeries were transferred to other physicians, and when Dr. Tempel arrived that July, TriHealth directed Shahbabian's referring physicians to send their neurological cases to Tempel. (*Id.*). Unaware of the agreement TriHealth made to transition his practice to Mayfield (and Dr. Tempel), Shahbabian reluctantly resigned his privileges. (*Id.*).

**B. Alleged False Claims Act Violation.**

Shahbabian pins his claims here on various alleged violations of the FCA, a federal law that prohibits medical providers from submitting false or fraudulent claims for payment to the United States. *Rahimi*, 3 F.4th at 822. As a general matter, complaints in such actions must provide specific examples of such charges. To clear that hurdle here, Shahbabian points, for example, to the treatment of "JM," a Medicare beneficiary and TriHealth/Mayfield patient. (*Id.* at #1122). JM arrived at Good Samaritan as an unassigned neurosurgical patient. Under the agreement described above, Good Samaritan referred JM to Mayfield for testing and possible

medical procedures. (*Id.*). Mayfield physician Dr. McPherson subsequently performed a cranial biopsy on JM at Good Samaritan, billing Medicare for $7,151.00. (*Id.*). Medicare paid Mayfield $1,425.05 for the procedure. (*Id.*). TriHealth also submitted several claims to Medicare for the services it provided in connection with the cranial biopsy: (1) $42,500.50 for the inpatient stay, of which Medicare paid $26,356.19, (2) $659.60 for an MRI, of which $219.53 was paid, and (3) an additional $612.00 related to the inpatient stay, of which $273.03 was paid. (*Id.* at #1123). Third-party providers submitted another six claims to Medicare for JM's care. (*Id.* at #1123–24). And, while JM is the only patient specified in the complaint, Shahbabian alleges that he was not the only such Medicare beneficiary for whom TriHealth and Mayfield submitted false claims.[2] (*Id.* at #1124).

The reason Shahbabian maintains that the claims submitted for JM, as well as other unnamed patients, were false is simple—the treatment was the result of *illegal* referrals. But his theory as to why the referrals were in fact illegal is a bit more complicated.

First, Shahbabian contends that TriHealth and Mayfield's arrangement described above violated the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b). The AKS prevents medical providers from offering or soliciting referrals in exchange for remuneration. While the complaint itself could be clearer on which referrals were offered for what remuneration, the scheme he describes appears to be something

---

[2] According to Shahbabian, "every procedure performed at a TriHealth facility by a Mayfield physician is tainted by their unlawful conduct, and the amount paid by a government insured medical plan to TriHealth and Mayfield for those claims is recoverable by the United States." (Doc. 9, #1126).

along these lines. TriHealth offered to do six things to benefit Mayfield: (1) transfer Shahbabian's surgical practice and referral base to Mayfield, (2) pay Mayfield for services it performed under the 2017 co-management agreement, (3) expend millions of dollars to upgrade Mayfield's neurosurgery facilities, (4) credential Dr. Andaluz, (5) grant Mayfield physicians Tier 1 referral status, and (6) refer all unassigned neuroscience patients at TriHealth facilities to Mayfield physicians. (Doc. 9, #1125–26). In return, Mayfield promised to refer its patients, which it had been sending to UC Health and other facilities, to TriHealth hospitals. This meant that TriHealth would receive the hospital revenues associated with those patients. (*Id.*). And given that alleged AKS violation, Shahbabian contends that any claims arising from the referrals in either way directly violate the FCA.

Shahbabian separately alleges that Defendants submitted false claims because the claims arose from service provided downstream of violations of the Stark law, 42 U.S.C. § 1395nn(a). The Stark law prohibits, subject to various exceptions, medical providers with a financial relationship from referring patients to one another. *Id.* Shahbabian says that ten Mayfield physicians had such a financial relationship with TriHealth because they received compensation from TriHealth under the 2014 and 2017 co-management agreements during the same period in which they referred their patients to TriHealth facilities. (Doc. 9, #1127–28). TriHealth in turn made claims for payment for services rendered by those physicians, also in violation of Stark. (*Id.*).

And not only does Shahbabian say the quid pro quo referral scheme was unlawful on both these grounds, he also says multiple individuals at TriHealth knew

of the scheme and its illegality. Those include Steve Gracey, the attorney responsible for regulatory compliance at TriHealth, Clement, the CEO, and Donovan, the COO. (*Id.* at #1130–32). Similarly, he alleges that Mayfield's director, Mark Farrington, knowingly violated the law. (*Id.* at #1132–33).

Based on all that, Shahbabian brings four distinct counts under the FCA on behalf of the United States. The first two can be categorized as direct claims—they allege that TriHealth, Good Samaritan, Bethesda North, and Mayfield directly violated § 3729(a)(1)(A) and § 3729(a)(1)(B) of the FCA by presenting false claims, and by making false statements, respectively, to the United States Government in connection with seeking payment. (*Id.* at #1136–38). His third claim is collateral to the first two—he contends that Defendants violated § 3729(a)(1)(C) of the FCA by conspiring with each other to submit those false claims. (*Id.* at #1138). And his final claim is that Defendants violated § 3729(a)(1)(G) by failing to return money received from the United States illegally because of the false claims. (*Id.* at #1139). As the description suggests, all four claims rely on the alleged underlying AKS and Stark violations to show falsity.

In terms of relief, Shahbabian requests that Defendants be enjoined from submitting any more false claims, that the Court award damages in favor of the United States in an amount equal to three times the amount of every false claim Defendants made, and that he, as relator, receive the maximum amount allowed under 31 U.S.C. § 3730, as well as costs and attorney fees. (*Id.* at #1140–41).

### C. Procedural History.

Shahbabian initiated this suit on January 27, 2020, more than six years ago. (*See* Doc. 1). But his legal efforts against TriHealth date back even further. In late 2018, after he lost his practice to Mayfield and saw his employment earnings clawed back, Shahbabian sued TriHealth and Mayfield, alleging breach of contract, age discrimination, disability discrimination, and fraud. (*See* Compl., *Shahbabian, M.D. v. TriHealth, Inc.*, No. 1:18-cv-790 (S.D. Ohio Nov. 14, 2018), Doc. 1). Shahbabian's claims in that action were different from the ones he raises here: he alleged that TriHealth and Mayfield conspired to force him out, claiming that he was too old to perform surgery. (*Id.*). At summary judgment (and after Shahbabian filed this case), this Court (through a different judge) dismissed those claims and found that instead, he must return $679,711.61 of his earnings to TriHealth for failing to meet the requirements of his employment contract—i.e., not conducting enough surgeries. *Shahbabian v. Trihealth, Inc.*, No. 1:18-cv-790, 2021 WL 3110073, at *13–18 (S.D. Ohio July 22, 2021). The Sixth Circuit affirmed that decision on appeal. *Shahbabian v. TriHealth Inc.*, No. 21-3762/22-3479, 2023 WL 2424603, at *6 (6th Cir. Mar. 9, 2023).

And there is yet another case related to the allegations above. Roughly ten months before Shahbabian sued, Timothy Murphy, TriHealth's former Physician Practices Chief Financial Officer, brought a separate FCA qui tam action against TriHealth, TriHealth Hospitals, and TriHealth Physicians alleging somewhat similar AKS and Stark Act violations. (Compl., *United States ex rel. Murphy v. TriHealth, Inc.*, No. 1:19-cv-168 (S.D. Ohio Mar. 4, 2019), Doc. 1). Aside from sharing defendants,

*Murphy* and this case share a similar (but, as discussed below, not identical) claim: that TriHealth paid Mayfield physicians in exchange for referrals. (*See id.* at #9–13). As the two cases proceeded, the United States declined to intervene in either. (Notice, Doc. 17; *see* Notice, *Murphy*, No. 1:19-cv-168 (S.D. Ohio May 6, 2024), Doc. 23).

Eventually, the TriHealth Defendants and Mayfield[3] moved to dismiss both this case and *Murphy* on several different grounds in several different motions. (Docs. 38, 40, 42, 45; *Murphy*, No. 1:19-cv-168, Docs. 64, 66). While filing separate motions, TriHealth and Mayfield largely made the same arguments. In both cases, Defendants argued that the FCA's qui tam provisions violate Article II's Appointments Clause and Take Care Clause and that the relators, Shahbabian and Murphy, lack Article III standing. (Docs. 38, 39, 45, 46; *Murphy*, No. 1:19-cv-168, Docs. 64, 65). Defendants also argued that this action is barred by the FCA's first-to-file rule because *Murphy* filed his complaint first. (Docs. 38, 39, 45, 46). Finally, Defendants argued in both cases that both relators failed to state a claim under Rule 12(b)(6) and failed to state fraud to the particularity demanded by Rule 9(b). (Docs. 40, 41, 42, 43; *Murphy*, No. 1:19-cv-168, Docs. 66, 67). Because of the overlap, Murphy moved for joint determination of related issues with this case, which the Court granted in part. (*Murphy*, No. 1:19-cv-168, 2/24/2025 Not. Ord.).

The Court ruled in both cases on the same day. In *Murphy*, the Court denied the defendants' motions to dismiss on all grounds. *United States ex rel. Murphy v. TriHealth, Inc.*, No. 1:19-cv-168, 2025 WL 2104279, at *18 (S.D. Ohio July 28, 2025).

---

[3] Mayfield is not a defendant in *Murphy*.

However, rather than allowing that case to proceed to discovery, the Court certified a constitutional question for interlocutory appeal (i.e., whether the FCA's reliance on a qui tam relator violates the Appointments and Take Care Clauses) and stayed the case in the meantime. (*Id.*).

In this case, the Court took a narrower approach.[4] The Court ruled against Defendants on their identical-to-*Murphy* constitutional and standing arguments and stayed this case as well pending the interlocutory appeal. (Doc. 66, #2381). But, because of that, the Court declined at that time to reach the 12(b)(6) (and 9(b)) argument and the first-to-file issue. (*Id.*).

Since then, the Sixth Circuit declined to take up the constitutional question. (Doc. 67 (denying Defendants permission to appeal)). So, the stay is over. *Murphy* has proceeded to discovery, (*see* Calendar Order, *Murphy*, No. 1:19-cv-168, Doc. 86), and this case's pending motions to dismiss are once again ripe.[5] However, once the stay lifted, Shahbabian filed his own request: that the Court consolidate his case with *Murphy*. (Doc. 68). Defendants oppose that motion. (Doc. 70).

[4] The Court reached all of Defendants' arguments in *Murphy* because the Court decided the question which prompted the stay, the FCA's constitutionality, last as a matter of constitutional avoidance. *Murphy*, 2025 WL 2104279, at *3 (citing *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002)). As the Court explained in its opinion, this case, by contrast, warranted a different approach for two reasons. (*See* Doc. 66, #2369). For one, the Court for all intents and purposes had already ruled on the constitutionality issue, so saving it for last would have little import. (*Id.*). Second, the Court had no option to save it for last, as deciding whether the *Murphy* complaint was "legally infirm" in the first-to-file analysis would necessarily require the Court to answer that same constitutional question. (*Id.* at #2369–70).

[5] Shahbabian recently filed additional authority opposing Defendants' motion to dismiss under the first-to-file rule. (Doc. 72). There, he cites several cases decided while this motion was held in abeyance and briefly repeats some of his arguments.

Below, the Court addresses those pending motions. Ultimately, the Court grants Defendants' motions to dismiss on Rule 12(b)(6) grounds, making the motion to consolidate moot, at least for now.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). While a "plausible" claim for relief does not require a showing of probable liability, it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The complaint must allege sufficient facts to allow the Court "to draw the reasonable inference that the defendant is liable." *Id.* "In reviewing a motion to dismiss, [the Court] construe[s] the complaint in the light most favorable to the plaintiff, draw[s] all reasonable inferences in [his] favor, and accept[s] all well-pleaded allegations in the complaint as true." *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But that does not mean the Court must take everything a plaintiff alleges at face value, no matter how unsupported. The Court may disregard "naked assertion[s]" of fact, "formulaic recitation[s] of the elements of a cause of action," and "mere conclusory statements." *Iqbal*, 556 U.S. at 678 (cleaned up). Additionally, the Court may grant a motion to dismiss "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citations omitted).

A court analyzing a motion to dismiss under Rule 12(b)(6) generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir.

2001). That said, "a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citations omitted).

**LAW AND ANALYSIS**

Defendants seek to dismiss Shahbabian's claims on multiple grounds. The Court has already ruled against Defendants on their Rule 12(b)(1) arguments as to Shahbabian's Article III standing and the FCA's constitutionality under Article II. (Doc. 66, #2364 (denying Defendant's Rule 12(b)(1) motions (Docs. 38, 45))). Remaining are Defendants' first-to-file and Rule 12(b)(6) arguments. The Court addresses both, finding against Defendants on the first, but for them on the second. The first-to-file argument fails because the operative complaint in *Murphy* at the time Shahbabian filed this action was legally infirm. But dismissal is still warranted as Shahbabian's complaint fails to state a claim under Rule 12(b)(6). That is because he fails to plausibly allege an underlying violation of either the AKS or the Stark law, meaning that there were no false claims to violate the FCA under any of his theories. And, because that warrants the dismissal of this matter, the Court dismisses Shahbabian's pending motion to consolidate as moot.

### A. The First-To-File Rule Does Not Bar This Suit as the Original *Murphy* Complaint Was Legally Infirm.

Before turning to the merits of the Rule 12(b)(6) motion, the Court must first decide whether the still-pending Murphy action bars Shahbabian's FCA suit. That is because the FCA has a built-in jurisdictional bar designed to prevent duplicative "parasitic lawsuits." *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 516 (6th Cir. 2009), *abrogated in part on separate issue by United States ex rel. Rahimi*, 3 F.4th at 829 (quotation omitted). This rule, known as the first-to-file bar, provides that "[w]hen a person brings an action under [the FCA], no person other than the government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). So, because *Murphy* was filed first, it bars this case if they are based on the same underlying facts. To decide whether two cases are based on the same facts, a court must compare the two complaints and decide whether both allege the same "essential" or "material" facts. *Poteet*, 552 F.3d at 516.

But there is an "important caveat to this first-to-file rule." For an earlier qui tam complaint to bar a later one, the earlier complaint cannot be legally infirm. *Id.* And a complaint is "legally infirm" if its allegations are insufficient under Rule 9(b). *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972–73 (6th Cir. 2005).

Shahbabian argues that the first-to-file rule does not bar this action for two separate reasons: (1) first, relying on the caveat above, he argues that the relevant *Murphy* complaint (more on that below) does not satisfy Rule 9(b), and (2) he says the *Murphy* complaint does not allege all the essential facts of this case. (Resp., Doc. 56, #2081). Because the Court agrees with the former, it does not reach the latter.

To answer the first-to-file question, the Court must first decide which version of the *Murphy* complaint matters to the analysis. That is because the Court has already ruled that *Murphy*'s Second Amended Complaint (the current operative complaint) is legally sound. (Op. & Order, *Murphy*, No. 1:19-cv-168, Doc. 77 (denying Defendants' Rule 12(b)(1) and 12(b)(6) motions to dismiss)). So, if that is the complaint that counts, Shahbabian's argument about legal infirmity seems doomed to fail. Shahbabian, though, says not so fast; he says the Court should look at the operative *Murphy* complaint *at the time Shahbabian initiated this action*. (Doc. 56, #2086, n.3). And that would be the *original* complaint in *Murphy*. (Doc. 1; *see* Compl., *Murphy*, No. 1:19-cv-168, Doc. 1). And on this score, the Court agrees with Shahbabian—for purposes of the first-to-file rule, the Court must look to the facts as they existed at the time the later action was brought. *United States ex rel. Cestra v. Cephalon, Inc.*, No. 14-01842, 2014 WL 5038393, at *3 (E.D. Pa. Oct. 9, 2014) (collecting cases).

Then, based on that original *Murphy* complaint, Shahbabian mounts only one line of attack to prove legal infirmity—that its allegations do not satisfy Rule 9(b). The attack at least starts on sound footing. The claims here, and in *Murphy*, arise under the FCA, meaning they sound in fraud. Accordingly, "[c]omplaints alleging FCA violations must comply with Rule 9(b)'s requirement that fraud be pled with particularity because 'defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts.'" *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quoting *Yuhasz v. Brush Wellman, Inc.*,

341 F.3d 559, 563 (6th Cir. 2003)). "To satisfy Rule 9(b), a complaint of fraud, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which [the plaintiff] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Marlar v. BWXT-Y-12, L.L.C.*¸ 525 F.3d 439, 444 (6th Cir. 2008) (citation modified). Applied to the FCA context, that means that a relator asserting a fraudulent scheme "must provide 'examples of specific false claims submitted to the government pursuant to that scheme.'" *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017).

Shahbabian says Murphy's original complaint does not plead any false claims with specificity. (Doc. 56, #2094). Ultimately the Court agrees. Under Sixth Circuit case law, Murphy could have supplied the requisite specificity in one of two ways. *United States ex rel. Owsley v. Fazzi Assocs., Inc.*, 16 F.4th 192, 196 (6th Cir. 2021). Most straightforwardly, he could have simply "identif[ied] a 'representative claim that was actually submitted to the government for payment.'" *Id.* (quoting *United States ex rel. Ibanez*, 874 F.3d at 915). "Alternatively, a claimant 'can otherwise allege facts—based on personal knowledge of billing practices—supporting a strong inference that *particular identified claims* were submitted to the government for payment.'" *Id.* (quoting *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 771 (6th Cir. 2016)).

The relevant *Murphy* complaint does not satisfy the first path to specificity. Murphy points to no specific claims that were submitted to the government for

payment. True, Murphy alleges a false *scheme*; but his original complaint makes only generalized assertions about false claims such as "TriHealth physicians submitted thousands of CMS 1500 forms to CMS," "TriHealth Defendants submitted claims to Medicaid," and "Defendants[] knowingly or in reckless disregard presented false claims for approval." (Doc. 56, #2094). That is not enough.

Nor would such allegations suffice under the second method. To satisfy that approach, Murphy would still need to allege the particulars of specific treatments and claims—meaning dates and amounts charged. *See Owsley*, 16 F.4th at 197 (finding that, despite allegations of "personal knowledge of billing practices" and specific instances of upcoding on patient forms, plaintiff failed to identify claims with specificity because there were no dates or amounts alleged).

Indeed, reviewing the original *Murphy* complaint shows it does not satisfy Rule 9(b)'s purpose: "provid[ing] the defendant with notice of a specific representative claim that the plaintiff thinks was fraudulent." *Id.* (citation omitted). And it is perhaps noteworthy that Murphy himself later amended his complaint to include specific claims, attaching them as an exhibit. (*See* Ex. 8, *Murphy*, No. 1:19-cv-168, Doc. 50-8). So, because the original *Murphy* complaint was "legally infirm" at the time Shahbabian filed this action, the first-to-file rule does not bar this case.

### B. Shahbabian Fails to State a Violation of the FCA Because He Does Not Plead Any Underlying AKS Or Stark Law Violations.

But apart from the first-to-file rule, both Mayfield and the TriHealth Defendants also move to dismiss on the merits. (Docs. 40, 41, 42, 43 (Rule 12(b)(6) motions to dismiss and supporting memoranda)). So that is the issue to which the

Court turns next. In doing so, the Court notes that Defendants have a tough hill to climb on this issue. This Court already found in *Murphy*—a case involving similar facts and a similar cast of characters—that the relator stated a viable FCA claim. But despite the difficulty of Defendants' task, they have convinced the Court that the allegations that Shahbabian puts forward in his complaint here are insufficient. In particular, Shahbabian does not point to a viable theory of remuneration to sustain an AKS violation, nor does he plausibly allege that TriHealth compensated Mayfield above fair market value in violation of the Stark law. And without plausibly alleging a violation of some underlying law, all of Shahbabian's FCA claims fail.

The Court acknowledges at the start that, at this stage of the litigation, "the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 502 (6th Cir. 2008) (citation modified). But, as noted above, because these are FCA claims, that analysis includes the heightened standard of Federal Rule of Civil Procedure 9(b). *United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 513–14 (6th Cir. 2022). To comply with Rule 9(b), the relator "at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which [the government] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)).

"When a relator 'alleges a complex and far-reaching fraudulent scheme, then that scheme must be pleaded with particularity and the complaint must also provide examples of specific fraudulent conduct that are representative samples of the scheme.'" *USN4U*, 34 F.4th at 514 (quoting *United States ex rel. Prather*, 892 F.3d at 830) (cleaned up).

The FCA aims to stop fraud on the government. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 181–82 (2016). To that end, the FCA provides that:

> [A]ny person who—
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
>
> …
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty … plus 3 times the amount of damages ….

31 U.S.C. § 3729(a)(1).

Shahbabian, acting as a relator on behalf of the government, brings direct claims under subparagraphs (A) and (B), conspiracy claims under (C), and reverse claims under (G). 31 U.S.C. § 3730(h). By statute, each of those theories requires falsity, meaning some form of fraudulent claim. And the sole theory on which

Shahbabian relies to show such fraud is that the Defendants submitted claims in violation of both the AKS and Stark law. (Doc. 9, #1134–35). But as the Court describes below, he fails to plausibly plead a violation of either statute. And without that foundation all of his claims fail.

### 1. Shahbabian Fails to Plead That Defendants Exchanged Remuneration for Referrals as the AKS Requires.

The AKS establishes criminal and civil liability for "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for the furnishing … of any item or service" reimbursable under a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(1). Liability flows the other way too, as "knowingly and willfully offer[ing] or pay[ing] any remuneration … to induce [a] person" to make any such referrals is prohibited as well. *Id.* § 1320a-7b(b)(2). And key for Shahbabian, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." *Id.* § 1320a-7b(g). "Resulting from" means claims submitted to federal healthcare programs that would not have been submitted *but for* the alleged kickbacks.[6] *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052–55 (6th Cir. 2023).

So what must Shahbabian show to make a prima facie case for an AKS violation? Shahbabian must allege that Defendants (1) "knowingly and willfully"

[6] As the Court explained in *Murphy*, but for causation is likely only required for FCA claims under subparagraph (A). 2025 WL 2104279, at *6–7.

(2) "solicit[ed] or receive[d]," or, the reverse, "offer[ed] or pa[id]," "any remuneration" (3) in return for, or to induce, referrals for "any item or service" reimbursable under a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(1)(A), (b)(2)(A); *Hathaway*, 63 F.4th at 1048 (citation omitted). Both Mayfield and TriHealth contest only[7] whether any of the exchanged benefits constitute "remuneration" as the statute uses that term, so that is where the Court focuses its efforts, as well. (*See* Doc. 41, #1880–87; Doc. 43, #1918–1924). That focus makes sense, as there is no question that TriHealth and Mayfield voluntarily entered into several agreements with one another to provide medical services, received federal reimbursement for those services, and referred patients to one another. So this claim turns on remuneration. On that issue, though, the Court sides with Defendants: Shahbabian fails to plead a viable theory of remuneration, meaning he cannot establish an AKS violation.

"The [AKS] does not define remuneration." *Hathaway*, 63 F.4th at 1048. In common parlance, though, the word usually indicates some form of payment or compensation. *See, e.g.*, *Remunerate*, DICTIONARY.com, https://www.dictionary.com/browse/remunerate [https://perma.cc/2ZGX-F4FK]. So what constitutes a "payment" in the medical referral context? The Sixth Circuit in *Hathaway* provided extensive guidance on that topic. In a detailed decision that painstakingly explored dictionaries, other uses of remuneration throughout the statutory landscape, and context, the court explained that remuneration as used in the AKS requires a

[7] While Defendants elsewhere contest whether Shahbabian alleged the requisite scienter under the FCA, they do not contest the "knowingly and willfully" element of the AKS. (*See* Doc. 43, #1918 n.1).

"payment" or "transfer" of value, and *does not* broadly extend to "any act that may be valuable to another," as the relator and the government had argued. 63 F.4th at 1048–52 ("While the word remuneration may be broad, it customarily requires a payment or transfer of some kind."). So that is the definition Shahbabian must meet.

Recall the basic structure of the deal. Mayfield (the physician group) would redirect its patients to TriHealth facilities. These redirected patients ultimately generated between $99,920,632 and $119,172,063 in facility fee revenue for TriHealth. (*Id.* at #1125). TriHealth promised six things in return: (1) the transition of Dr. Shahbabian's surgical practice and referral base to Mayfield physicians, which amounted to some 270 to 300 procedures per year; (2) payments made to Mayfield physicians for services, which totaled in excess of $2,000,000 a year under the 2017 co-management agreement; (3) the expenditure of over $46,000,000 into neurosurgery facility upgrades at TriHealth facilities; (4) TriHealth credentialing Dr. Andaluz, a Mayfield doctor; (5) TriHealth changing the status of Mayfield physicians to Tier 1 referral status; and (6) the referral of all unassigned neurosurgical patients by TriHealth to Mayfield physicians for procedures to be performed at TriHealth medical facilities. (*Id.* at #1125–26). And remember, the AKS prohibits both paying *and* receiving remuneration for referrals, so if any of the above listed benefits constitute remuneration as pleaded, Shahbabian has adequately shown that all Defendants violated the AKS. Ultimately, though, the Court finds that, on the facts alleged, none of the benefits are the types of remuneration prohibited by the statute as *Hathaway* defines that term.

Start with two easy ones: the doctor's credentialing and facility upgrades. Dr. Andaluz's "credentialing" is not remuneration. (*Id.* at #1125). As best as the Court can tell from the complaint, that credentialing meant granting Dr. Andaluz's admitting privileges at TriHealth hospitals. (*Id.* at #1088). That is not a payment or transfer. While it undoubtedly may have value to Dr. Andaluz (and by extension Mayfield), credentialing strikes the Court as simply one example of an "act that may be valuable to another" that *Hathaway* rejected as remuneration. 63 F.4th at 1048. Indeed, if a hospital granting a doctor privileges constitutes remuneration under the AKS, an AKS violation would seem to arise any time a hospital did so, as presumably the newly credentialed doctor would be bringing along (i.e., referring) at least some number of patients to receive care at that hospital.

*Hathaway* also imposes a hurdle for Shahbabian's theory that TriHealth's expenditure of $46,000,000 to update TriHealth hospitals to accommodate the relocated UC Health surgical cases is "remuneration." (*See* Doc. 9, #1126). In *Hathaway*, the Sixth Circuit pointed to the example of a hospital upgrading its facilities and equipment to attract doctors and referrals as an act that was *not* remuneration. 63 F.4th at 1050. And the court's reasoning makes sense—a hospital investing in its own facilities to improve patient care is not a transfer or payment to other doctors, even if those doctors might sometimes use those facilities to treat their own patients. Perhaps the Court can imagine a point where upgraded accommodations for referring doctors begin to look more like individual perks (e.g.,

handing out designer lab coats for free) that could constitute a "transfer," but Shahbabian does not allege facts such as that here.

But with those out of the way, some harder questions remain. Start with this one—did the cash payments from TriHealth to Mayfield under the 2014 and 2017 co-management agreements plausibly constitute remuneration? (Doc. 9, #1084, 1090, 1120–21, 143–44). Defendants admit that under both co-management agreements there were "actual transfers of funds," which certainly *could* fall within *Hathaway*'s definition of remuneration. (Doc. 41, #1885; Doc. 43, #1923). But such transfers are problematic only if they occur *in exchange for referrals*, instead of for some other, permissible reason. *See* 42 U.S.C. § 1320a-7b(b)(1)(A), (b)(2)(A).

In sum, the question is whether the complaint plausibly ties the compensation TriHeath paid (and Mayfield received) *to the referrals*. Defendants argue that those payments were in return for legitimate services provided, not referrals. And the complaint itself acknowledges that the 2017 co-management agreement, for instance, was for Mayfield's provision of "On-call, Medical Director, and … Quality Initiative Services." (Doc. 9, #1120–21). Defendants also make much of the fact that Shahbabian included in the complaint an email from TriHealth's general counsel during the negotiations over the 2017 co-management agreement, which expressed the need for metrics and compensation to "not [be] related to volume/value of physician referrals." (Doc. 41, #1887 (discussing Doc. 9, #1105); Doc. 43, #1923).

While concededly a close call, the Court finds that Shahbabian does not allege sufficient details for the Court to infer that the compensation paid under these two

agreements was for referrals (as opposed to for services). True, if Mayfield was in fact compensated above market rate, or was not actually performing the contracted-for work, the payments could constitute forbidden remuneration. *See United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 171 (3d Cir. 2019) ("Compensation for personal services above the fair market value of those services can suggest that the compensation is really for referrals."). But Shahbabian's conclusory allegations on that front provide no basis for the Court to reasonably infer that is happening. He asserts, repeatedly, that the deals were entered without "any valid fair market value determination," and instead constituted payments taking "into account the anticipated volume and value of referrals between TriHealth and Mayfield." (*Id.* at #1121; *see also id.* at #1084). But he alleges no actual *facts* supporting either of those conclusions beyond his also-conclusory allegation that the quality initiatives Mayfield was to create were a "sham." (*Id.* at #1118). For example he points to no aspect of the doctors' compensation that suggests that this compensation will (or did) fluctuate based on referral volume, nor does he provide any support or reason suggesting why the co-management agreements are not fair market value. The complaint merely states the rates TriHealth paid Mayfield for the various services under the agreements. (*See, e.g.*, Doc. 9, #1084 (stating that TriHealth compensated Mayfield $80,417 per month for on-call services and $175,000 per year for the achievement of

quality initiative targets)). But it does not allege any facts suggesting why those rates might constitute above-market payment for those services.[8]

The closest Shahbabian comes to establishing some connection between Mayfield's transfer of patients and compensation under the co-management agreement is when he points to a 2016 email from a third-party consultant to TriHealth executives outlining "core assumptions" for a pro forma agreement between TriHealth and Mayfield. (Doc. 9, #1103; Doc. 9-22). That email lists on one page, as a core assumption, the projected volume of UC cases that specific Mayfield doctors will be performing at the TriHealth hospitals. (Doc. 9-22, #1341). Then, listed on the next, is the core assumption that the partnership with Mayfield will include a new co-management agreement, as well as "commitments for additional Mayfield neurosurgical activity." (Doc. 9-22, #1342). That email, and the facts Shahbabian alleges around it, do suggest a larger plan between Defendants to deepen their relationship. That broader scheme, as alleged, included both transitioning patients to TriHealth hospitals and entering a co-management agreement, the latter of which included compensation. But that still does not fix the complaint's problem: the lack of non-conclusory allegations showing that compensation paid under the co-management agreement was to *induce* those referrals. The email discussing both agreements in the same place does not change that. To find in Shahbabian's favor,

[8] Perhaps Shahbabian could set forth a theory that while the co-management agreements are for a fair market rate, they constitute remuneration because that business would not have been generated for Mayfield *but for* the promise to supply referrals. Or, in other words, that Mayfield won the contract over competitors because TriHealth sought to induce referrals. The Court reserves the question of whether that might constitute remuneration, as Shahbabian does not make that argument.

the Court would need to adopt an interpretation of the AKS that bars a doctor who is receiving compensation from a hospital from referring patients to that hospital, even absent any allegations that the compensation is for, or intends to induce, those referrals. The Court declines to do so.

Finally, the Court finishes by considering the remaining forms of potential remuneration that Shababian alleges: the facility-fee revenue generated by Mayfield's redirection of patients to TriHealth hospitals, the transition of Dr. Shahbabian's surgical practice and referral base to Mayfield physicians, the referral of all unassigned neurosurgical patients at TriHealth hospitals to Mayfield, and the change of Mayfield physicians to Tier 1 referral status. (Doc. 9, #1125–26). These four theories of remuneration share a potential defect: in each, the only thing of value that changed hands was, at its core, a referral.

Start with the facility fees. True, the fees themselves are monetary payments. But Mayfield is not paying fees to TriHealth; rather, TriHealth is generating fees from others (i.e., insurers, including federal programs) because of Mayfield referring and treating patients.[9] Likewise, the transition of Dr. Shahbabian's practice to Mayfield physicians is, at bottom, about referrals—TriHealth simply redirected patient flow that would otherwise have gone to Shahbabian toward Mayfield instead,

[9] Defendants do not contest whether Mayfield physicians moving procedures they themselves perform to TriHealth hospitals constitutes a "referral" as the AKS uses that term. Regardless, the Court finds that the practice constitutes a referral, as, aside from the facility-fee revenue generated, some of the "items or services" connected to the procedure were undoubtedly performed by various TriHealth staff. And generally, other courts have defined "referral" broadly in the AKS context. *See, e.g.*, *United States v. Patel*, 778 F.3d 607, 612–13 (7th Cir. 2015) (holding that a physician "refers" a patient under the AKS by certifying or authorizing care, even without personally directing the patient to a particular provider).

presumably resulting in Mayfield receiving reimbursements that otherwise would have gone to him. Likewise, the value of TriHealth's policy changes—elevating Mayfield to Tier 1 status and steering unassigned patients to Mayfield—lies entirely in the increased likelihood of future referrals and the revenues they generate. (*Id.* at #1099 n.3 (describing the Tier 2 to Tier 1 change)).

As to each of these, then, the Court must decide a common question: can referrals themselves, unaccompanied by any other payment or transfer, constitute remuneration under the AKS? Put differently, does the AKS reach a purely referral-for-referral arrangement between two providers?

Shahbabian (briefly) says yes. (Doc. 9, #1071 ("Patient referrals from one medical provider to another are a form of remuneration.")). He finds some support in an out-of-circuit district court case, *State v. MedImmune, Inc.*, 342 F. Supp. 3d 544, 552 (S.D.N.Y. 2018), which found that patient information used to generate referrals "could constitute a form of remuneration" under the AKS—reasoning that traces back to Southern District of New York's observation in *United States ex rel. Kester v. Novartis Pharmaceuticals Corp.*, 41 F. Supp. 3d 323, 326 (S.D.N.Y. 2014), that patient referrals themselves are "a form of remuneration."

But in this circuit, *Hathaway*—at least in dicta—seems to say no. 63 F.4th at 1051. Recall that *Hathaway* adopted a narrower reading of remuneration, declining to embrace an "anything-of-value" definition. *Id.* at 1048–52. Applying that narrower reading, the *Hathaway* court held that a hospital's decision not to hire an in-house ophthalmologist at the behest of a competitor did not constitute remuneration, even

though the decision preserved a stream of referrals flowing to, and from, that competing provider. *Id.* at 1051. There, as here, referrals were the only thing of value either party offered. The ophthalmologist offered a "general commitment to continue sending surgery referrals to [the hospital]," while the hospital only acted to prevent its referrals from being sent in house. *Id.*

To be sure, part of the Sixth Circuit's reasoning in *Hathaway* turned on the fact that the hospital was not offering anything *new*—it was simply declining to act. *Id.* That distinction might leave room for a plaintiff to plead a referrals-as-remuneration theory where the complaint alleges a specific, new stream of referrals being offered, rather than the mere preservation of an existing one. But, in dicta, the *Hathaway* court went further, observing that "[e]ven under an anything-of-value definition of remuneration, moreover, it is doubtful that the [plaintiffs] allege[d] a cognizable referrals-for-referrals scheme." *Id.* That statement is telling. It suggests the *Hathaway* court viewed the anything-of-value definition—the very definition it declined to adopt—as a necessary precondition to a viable referrals-for-referrals theory. Strip away that broader definition, as *Hathaway*'s holding requires, and a pure referral-swap theory seemingly has nothing left to stand on.

This Court agrees with that reading. A referral—particularly the referral of a patient who has not yet sought care—is too far removed from a "payment" or "transfer" to satisfy the AKS's remuneration element. No party holds a definite, existing interest in a potential patient that could be "transferred" to another; there is only the prospect, or hope, of a future referral. Accordingly, all four of the remaining

theories—the facility-fee revenue, the transition of Shahbabian's practice, the Tier 1 status change, and the unassigned-patient referral policy—fail as a matter of law, because each rests entirely on the value of referrals themselves and nothing more.

In short, Shahbabian fails to allege any viable theories of remuneration, so there can be no underlying violation of the AKS.

**2. Shahbabian Fails to Plead a Violation of the Stark Law Because on the Face of the Complaint, the Personal Services Exception Applies.**

Shahbabian fares no better at alleging an underlying Stark law violation. The Stark law broadly bans healthcare entities from submitting Medicare claims for payment when that entity has a financial relationship with the referring doctor, subject to various exceptions. *United States ex rel. Daugherty v. Bostwick Lab'ys*, No. 1:08-cv-354, 2012 WL 6593804, at *6 (S.D. Ohio Dec. 18, 2012) (citing 42 U.S.C. § 1395nn). Defendants do not dispute their financial relationship, instead arguing that they fall into one such exception.

Recall that, to allege an FCA violation, Shahbabian must plausibly allege falsity. *See supra* Part B.1. As just described, the Court concludes that he has not shown falsity based on an AKS violation. So his remaining option is to plausibly allege a Stark violation. Other circuits have held, and Defendants do not contest, that a Medicare claim that violates Stark is a "false claim" for purposes of the FCA. *E.g.*, *Bookwalter*, 946 F.3d at 169; *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 565 F. Supp. 2d 153, 159 (D.D.C. 2008).

To make a prima facie case for a Stark Law violation, Shahbabian must allege: (1) a referral for designated health services, (2) a financial relationship, and (3) a Medicare claim for the referred services. *Bookwalter*, 946 F.3d at 169. Under Stark, a financial relationship includes a compensation arrangement involving "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind" between physician and the entity providing the referred services. 42 U.S.C. § 1395nn(a)(2), (h)(1)(B). Because the remuneration does not have to induce, or be for, the referred services, Shahbabian avoids the problem the Court described above as to his AKS-based theory. And with that out of the way, the 2014 and 2017 co-management agreements constitute a financial relationship for Stark purposes, which Defendants do not dispute. Indeed, Defendants largely do not dispute the prima facie elements at all; instead they argue that the "personal services" exception applies. (Doc. 41, #1888–91; Doc. 43, #1924–30).

"On its face, the Stark Act's ban sweeps in lots of common situations," and so it contains many exceptions to preserve common relationships in the medical field. *Bookwalter*, 946 F.3d at 169. One such exception is for "[p]ersonal service arrangements." *See* 42 U.S.C. § 1395nn(e)(3). That exception allows referrals when an entity has entered a more than year-long arrangement with a physician compensating that physician for specific services performed. *Id.* So Defendants are off to a strong start—the basis for the alleged Stark violation is TriHealth agreeing to compensate Mayfield physicians for specific services performed under both the 2014 and 2017 co-management agreements. (Doc. 9, #1127). However, the exception

has another element—that the compensation be for "fair market value" and not determined in a manner that takes into account the "volume or value of any referrals." 42 U.S.C. § 1395nn(e)(3)(A)(v). Just as he did in the AKS context, Shahbabian says that the arrangement here stumbles on this latter step.

Before discussing Shahbabian's allegations more fully, the Court pauses to address a procedural issue related to reliance on Stark law exceptions at the pleading stage. As the Court discussed in *Murphy*, there is some question whether an exception to the Stark Law should be treated as an affirmative defense. 2025 WL 2104279, at *11. The question is one of burden shifting—whether the burden is on plaintiffs to plausibly allege that the exception does not apply, or whether the burden instead is on defendants to prove, at some later point in the litigation, that it does. *United States v. Williams*, 70 F.4th 359, 364 (6th Cir. 2023) ("The burden of proving affirmative defenses rests with the defendant … [t]hat reality stretches from criminal law to civil law, and from Blackstone to the present."). At least one other circuit, the Third, addressing the question in a reported decision, has treated Stark exceptions as affirmative defenses. *See Bookwalter*, 946 F.3d at 177. Here, Shahbabian argues that the personal service exception is an affirmative defense, (Doc. 9, #1074), and at least one of the defendants appears to concede as much, (Doc. 41, #1889). Moreover, that seems right. As the Third Circuit explained, the statutory structure—which separates out the exceptions—supports that reading. *Bookwalter*, 946 F.3d at 169. And, as that court also observed, it would be a lot to ask of an FCA plaintiff to plead around all possible exceptions. *See id*. at 177 (noting that "[i]t is thus the defendants'

burden to plead a Stark Act exception, not the relators' burden to plead that none exists"). So the Court concludes it must treat the exception as an affirmative defense.

Understood that way, the burden of "proving" that the personal service exception applies falls on Defendants. That is typically a tall order at the motion to dismiss stage. After all, at this point in the case, the only facts Defendants can point to in their efforts to establish the exception's elements are those that Shahbabian supplied in his complaint. So, while it may be true that "[t]here is no reason not to grant a motion to dismiss where the undisputed facts conclusively establish an affirmative defense as a matter of law," *Est. of Barney v. PNC Bank, Nat'l Ass'n*, 714 F.3d 920, 926 (6th Cir. 2013) (quoting *Hensley Mfg. v. ProPride, Inc.,* 579 F.3d 603, 613 (6th Cir. 2009)), here the allegations do not allow Defendants to clear the conclusively-establish hurdle. To put a point on it, the key issue as to whether the exception applies here is the question of whether the compensation that the hospital agreed to provide reflects only the "fair market value" of the services for which the hospital is paying. Shahbabian's allegations certainly do not "conclusively establish" that is the case. Indeed, he alleges that exactly the opposite is true—that the hospital is paying the doctors in excess of market value.

One might think that is the end of the story. The personal services exception is an affirmative defense, and the allegations in Shahbabian's complaint do not conclusively establish that the Defendants meet it here. That suggests that the Defendants lose. But the Court concludes that is not the case. Recall that Shahbabian is pursuing a False Claims Act claim, a cause of action that requires some form of

underlying fraud. That means two pleading principles come into play. First, under Rule 9(b) he must plead fraud with particularity. And second, under *Iqbal* and *Twombly*, his allegations must make it at least plausible that such fraud occurred. So, while Shahbabian is by no means required to plead around the personal services exception (and all of the other exceptions), he is still required to provide the Court some reason, grounded in specific facts, to believe that the compensation agreement here is not on the up and up. After all, presumably the run-of-the-mill compensation arrangement between hospitals and physicians is not serving as a cover for a fraudulent pay-to-play referral scheme. So Shahbabian needs to provide *some* reason to plausibly suggest that the agreement here is the fraudulent, illegitimate needle in the legitimate-hospital-physician-contract haystack.

Take *Bookwalter* as an example. There, as the Court noted above, the Third Circuit concluded that Stark law exceptions are affirmative defenses, and that a plaintiff need not plead around them. But that did not mean that the court allowed the complaint at issue there to move forward merely because the plaintiff had shown the three elements of the prima facie case for a Stark law violation. To the contrary, the court noted that the complaint had specified in "great detail" facts suggesting fraud:

> Dozens of [the complaint's] paragraphs go into great detail about specific physicians' Work Units and pay levels. The complaint compares those figures at length with industry benchmarks, medians, and 90th percentiles. It alleges specific ways that surgeons padded their bills, by for instance falsely reporting unperformed work assisting other surgeons or physically supervising residents and interns.

*Bookwalter*, 946 F.3d at 176–77.

Contrast that with Shahbabian's complaint here. True, he *alleges* that the financial arrangement both (1) exceeds fair market value, and (2) takes into account the volume or value of that doctor's referrals. (Doc. 9, #1074). Indeed, he specifically states that the terms "were not fair market value, but based upon the volume and value [of referrals]." (*See id.* at #1128). And if he plausibly alleged either of those with the specificity that Rule 9(b) requires, that undoubtedly would be enough. But he doesn't. Unlike the *Bookwalter* plaintiffs, he offers almost no *factual* allegations in support of his conclusory assertions. Indeed, as to the lack of fair market value, the only detail he provides is that, upon his information and belief, there was no fair market value determination before either agreement was approved. *(Id.* at #1084, 1120). And, while he alleges that under the 2017 co-management agreement TriHealth would pay over $2,000,000 a year to Mayfield, he includes *no facts* suggesting why that would be an overpayment, let alone any relevant benchmarks against which it should be compared. *See United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-cv-00484, 2013 WL 146048, at *13 (N.D. Tenn. Jan. 14, 2023) (declining to find AKS or Stark law violations where relator offered no details on why the compensation was in excess of fair market value); *United States ex rel. Osheroff v. Tenet Healthcare Corp.,* No. 1:09-cv-22253, 2012 WL 2871264, at *7 (S.D. Fla. July 12, 2012) (dismissing claims where the relator did not "allege a benchmark of fair market value against which Defendants' rents to physician-tenants can be tested," without which it was impossible to "infer whether Defendants' rents to physician-tenants fall sufficiently below the benchmark so as to constitute remuneration").

Certainly, nothing on the face of the agreements suggests that the rates exceed fair market value. TriHealth paid $80,417 per month for on-call services from Mayfield's doctors under the 2014 co-management agreement, (Doc. 9-2, #1173), and $95,417 per month for the same under the 2017 agreement, (Doc. 9-3). Depending on the services provided, that is not per se outrageous. And again, Shahbabian has alleged no facts that suggest comparable on-call neurosurgery services should have commanded a lower fair-market price or that the parties colluded or engaged in price fixing. Quite the opposite, the pleadings also show that the parties negotiated those rates over the years. (*See generally* Doc. 9). With no other wider context about industry, the Court concludes that the most plausible inference is that the contracts are for a fair market value.

Admittedly, compensation under the agreements also cannot be based on the value and volume of referrals Mayfield brought to TriHealth. 42 U.S.C. § 1395nn(e)(3). And Shahbabian again asserts that Mayfield physicians did in fact receive bonuses and stipends based on the number of patients they brought to TriHealth. But once again he alleges no facts suggesting that is the case.[10] (Doc. 9, #1128). And as the Court discussed under the AKS analysis, the closest Shahbabian comes to alleging an agreement tying pay to the volume of referrals is by pointing to the 2016 email from the third-party consultant which listed the projected transfer of

[10] These are patients that Mayfield doctors treated at TriHealth facilities. So presumably—although Shahbabian does not allege this—doctors' earnings increased as their patient numbers grew—i.e., the more they worked. That is not the same as illicit compensation for referrals, which would look more like TriHealth paying kickbacks based on the number of patients transitioned from UC Health to TriHealth facilities.

procedures from UC Health to TriHealth hospitals by fiscal year 2021. (Doc. 9-22, #1341). So while the facts do support a plan between Defendants to refer patients to TriHealth, that email discussion makes no mention of any bonuses or stipends tied to that transition. Nor does it tie the compensation paid under the co-management agreements—the "financial relationship" pointed to for Stark purposes—to those figures.

The 2014 and 2017 contracts themselves contradict Shahbabian's theory, with each explicitly disallowing "compensation to any Physician in connection with … the volume or value of referrals or other business generated by that physician for TriHealth." (Doc. 9-1, #1153; Doc. 9-3, #1188). Finally, as discussed earlier, the complaint also includes an email from TriHealth's legal counsel to another TriHealth executive noting that the 2017 co-management agreement must include "appropriate metrics that are not related to volume/value of physician referrals." (Doc. 9, #1105).

The long and short of it is that Shahbabian has not alleged, and certainly not with the specificity that Rule 9(b) requires, any facts giving rise to a plausible inference that the compensation arrangement between TriHealth and the physician group is illicit in any way. And absent that, he has not plausibly alleged a Stark law violation.

**3. Because Shahbabian Fails to Allege an Underlying Violation, All His Claims Must Be Dismissed.**

In sum, Shahbabian pleads neither an AKS nor a Stark violation, which in turn means he has not pleaded that any false claims were submitted to the government. That dooms all his claims under the FCA—either direct or indirect. As

to the former—i.e., his direct claims under subparagraphs (A) and (B)—Shahbabian's only theory of "false claims" relied on the underlying violations, so without those, he has nothing. But the lack of an underlying violation also dooms his conspiracy and reverses claims under subparagraphs (C) and (G). Here's why.

Start with conspiracy. Shahbabian's conspiracy claim, alleging a violation of 31 U.S.C. § 3729(a)(1)(C), is asserted in connection with his two counts alleging violations of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B). Meaning, he alleges that Defendants conspired to knowingly submit false claims by doing the conduct that he says constituted the direct violations. (Doc. 9, #1138). Since the Court has concluded that Shahbabian fails to plausibly allege that the conduct violates the FCA, his derivative FCA conspiracy claim is also dismissed. *See United States v. Wal-Mart Stores E., LP*, 858 F. App'x 876, 879 (6th Cir. 2021) (citing 31 U.S.C. § 3729(a)(1)(C) (finding that relator's conspiracy claim fell along with the substantive FCA claims).

The reverse claims under subsection (G) have a similar problem. To state a reverse claim, Shahbabian must allege that Defendants (1) knowingly (2) made, used, or caused to be made or used false records or statements material to (3) an obligation owed to the government, or alternatively, that Defendants (1) knowingly (2) concealed or improperly avoided (3) an obligation owed to the government. 31 U.S.C. § 3729 (a)(1)(G). An "obligation" includes the "retention of any overpayment." *Id.* § 3729(b)(3). Shahbabian's reverse claim is based on the allegation that the United States overpaid Defendants as result of the false claims submitted. (Doc. 9, #1139–40). But because Shahbabian fails to plead that any false claims were

submitted, the Court cannot infer that there was any overpayment that Defendants have an established duty to repay.

### D. The Court Dismisses Shahbabian's Motion to Consolidate as Moot.

That brings the Court to Shahbian's request to consolidate his case with *Murphy*. (Doc. 68). Because the Court is dismissing all of Shahbabian's claims, that request is now moot. That said, if Shahbabian successfully addresses the deficiencies identified by the Court in his complaint by amendment, he is free to renew his motion to consolidate.

* * *

Simply put, Shahbabian fails to specifically allege facts that allow the Court to plausibly infer that Defendants violated either the AKS or the Stark law. Because that is his only basis for asserting that Defendants submitted false medical claims to the United States, his FCA claims all fail. That said, because the Court dismisses based on pleading defects, it does so without prejudice. To that end, the Court grants Shahbabian thirty days to seek leave to amend his complaint if he wishes to do so and can address the pleading defects set forth above.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' motions to dismiss, (Docs. 40, 42). But because Shahbabian could cure the defects through new allegations, the Court **DISMISSES WITHOUT PREJUDICE**. Accordingly, the Court **GRANTS** Shahbabian thirty days in which to file a motion for leave to file an amended complaint, attaching the proposed complaint. The Court will retain

jurisdiction over this matter during that time. But, if he fails to do so, the Court will **DIRECT** the Clerk to enter judgment dismissing this action without prejudice and to **TERMINATE** this case on its docket. Additionally, the Court **DENIES** Shahbabian's motion to consolidate, (Doc. 68), as **MOOT**.

**SO ORDERED.**

October 9, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**